

**FILED**

Apr 23 2020, 9:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Paula M. Sauer
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Roger Thayer,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

April 23, 2020

Court of Appeals Case No.
19A-CR-2363

Appeal from the Hendricks
Superior Court

The Honorable Mark A. Smith,
Judge

Trial Court Cause No.
32D04-1902-F2-6

**Bradford, Chief Judge.**

# Case Summary

[1]     Roger Thayer was charged with Level 4 felony possession of methamphetamine after being found to be in possession of 13.52 grams of methamphetamine. Prior to trial, Thayer unsuccessfully moved to suppress the evidence discovered during what he claims was an unjustifiably prolonged traffic stop. Thayer unsuccessfully renewed his evidentiary challenge at trial before stipulating to the relevant facts to prove that he possessed the 13.52 grams of methamphetamine. Relying on the stipulation, the trial court found Thayer guilty of the possession charge. On appeal, Thayer contends that the trial court abused its discretion in admitting the challenged evidence. We affirm.

# Facts and Procedural History

[2]     Shortly before midnight on February 25, 2019, Pittsboro Police Officer Nicholas Webber initiated a traffic stop after observing a truck driving on westbound I-74 with no working taillights or license plate illumination. Thayer was the driver and sole occupant of the truck. While speaking to Thayer, Officer Webber noticed that Thayer "kept trying to reach something under items on the passenger seat and twisting his body … making large movements as if he was diving … to something on the passenger side. He was trying to look for something either on the floorboard or under items on the passenger seat. And it was a large truck, so, his whole body was moving, while he was doing it." Tr. p. 9. Thayer was "acting very nervous and kept moving." Tr. p. 12. Officer Webber described Thayer's actions as "erratic." Tr. p. 33.

[3]     Officer Webber asked Thayer for his driver's license and the vehicle's registration. Thayer did not have his driver's license or any other form of identification on him. Thayer orally identified himself and indicated that he was driving a friend's truck. Thayer provided Officer Webber with some form of registration or title paperwork for the truck, dropping it onto the interstate when he attempted to hand it to Officer Webber. After retrieving the paperwork from the lanes of travel, Officer Webber returned to his police-issued vehicle to confirm Thayer's identity and the registration status of the vehicle.

[4]     After approximately five minutes, Officer Webber was able to obtain BMV confirmation that a person by the name of Roger Thayer had a valid driver's license. Due to safety concerns stemming from Thayer's extreme nervousness and erratic behavior, Officer Webber ran a criminal background check in an attempt to further confirm Thayer's identity. Officer Webber eventually received additional identifying information, but "the very first thing that pop[ped] up" was a red caution flag indicating that Thayer is someone with a "potential for violence." Tr. p. 17.

[5]     Upon receiving the warning of Thayer's potential for violence, Officer Webber, who was working the nightshift alone in Pittsboro, requested backup assistance from Officer Kevin Hyde, a nightshift K9 officer in nearby Brownsburg. While waiting for Officer Hyde to arrive, Officer Webber ran the license plate information for the truck. Officer Webber also reviewed his incident history and began manually entering Thayer's identifying information into his traffic-stop report and ticket-issuance software. Normally, when an individual

provides a driver's license or identification card during a traffic stop, Officer Webber scans the license or identification card and the computer in his police-issued vehicle populates the information in a ticket. However, because Thayer had no driver's license or identification card, Officer Webber had to manually enter all of the relevant information. Officer Webber was in the process of entering Thayer's information and issuing Thayer tickets for the inoperable taillights and license plate illumination when Officer Hyde arrived on the scene approximately five to ten minutes after receiving Officer Webber's request for backup.

[6] Officer Webber told Officer Hyde that he had observed Thayer make furtive movements toward the center of the vehicle and asked if Officer Hyde would walk his K9 around the vehicle. Officer Hyde agreed and, after Officer Webber removed Thayer from the truck, walked his K9 along the driver's side of the truck to conduct "a free air sniff" of the truck. Tr. p. 64. The K9 "gave an active alert" when he got to the driver's door/window. Tr. p. 64.

[7] After receiving the alert from his K9, Officer Hyde began a search of the vehicle, finding a glass methamphetamine pipe in the center console. At that point, Officer Webber placed Thayer under arrest and conducted a pat-down search of Thayer's person. During this search, Officer Webber found a baggie containing what was ultimately determined to be 13.52 grams of methamphetamine and a pipe in Thayer's "left breast jacket pocket." Appellant's App. Vol. II p. 66. Thayer admitted that he had purchased the methamphetamine earlier that day and used "the found pipes to smoke it."

Appellant's App. Vol. II p. 66. In a further search of the truck, Officers Hyde and Webber found "three (3) scales with residue of an off-white substance, eight (8) syringes, numerous small baggies, straws with an off-white substance, and two (2) additional pipes containing an off-white burnt substance." Appellant's App. Vol. II p. 66.

[8] On February 26, 2019, the State charged Thayer with Level 2 felony dealing methamphetamine, Level 4 felony possession of methamphetamine, Level 6 felony possession of a syringe, and Class C misdemeanor possession of paraphernalia. On May 13, 2019, Thayer filed a motion to suppress "all property seized by the arresting officers, all observations made by the arresting officers, and all statements made by [Thayer]." Appellant's App. Vol. II p. 38. Following a hearing, the trial court denied Thayer's motion to suppress.

[9] On July 8, 2019, Thayer agreed to waive his right to a jury trial and, in exchange, the State agreed to dismiss the dealing and paraphernalia charges, proceeding only with the Level 4 felony possession charge. At the beginning of the July 23, 2019 bench trial, Thayer renewed his challenge to the admission of the State's evidence. The trial court denied Thayer's renewed challenge, indicating that it would "stand on" its prior ruling. Tr. p. 89. The case was submitted to the trial court on stipulated evidence, and the trial court found Thayer guilty of Level 4 felony possession of methamphetamine. On September 9, 2019, the trial court imposed a seven-year sentence, with four years executed, three years suspended, and one year of probation.

# Discussion and Decision

[10]     Thayer contends that the trial court abused its discretion in admitting evidence recovered during what he claims was an unjustifiably prolonged traffic stop. "In cases such as this one, where the defendant does not appeal the denial of a motion to suppress and the evidence is admitted over the defendant's objection at trial, we frame the issue as whether the trial court abused its discretion in admitting the evidence at trial." *Kyles v. State*, 888 N.E.2d 809, 812 (Ind. Ct. App. 2008).

> The admission or exclusion of evidence is entrusted to the discretion of the trial court. *Farris v. State*, 818 N.E.2d 63, 67 (Ind. Ct. App. 2004). We will reverse a trial court's decision only for an abuse of discretion. *Id*. We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Taylor v. State*, 891 N.E.2d 155, 158 (Ind. Ct. App. 2008). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id*.

*Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012). "Moreover, the trial court's ruling will be upheld if it is sustainable on any legal theory supported by the record, even if the trial court did not use that theory." *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008) (citing *Gonser v. State*, 843 N.E.2d 947, 950 (Ind. Ct. App. 2006)).

[11]     In arguing that the trial court abused its discretion in admitting the challenged evidence, Thayer claims that the challenged evidence was recovered in

violation of the Fourth Amendment to the United States Constitution and Article 1, Section 11, of the Indiana Constitution. The Fourth Amendment provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.[1] "The fundamental purpose of the Fourth Amendment to the United States Constitution is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006).

[12] "Notwithstanding the textual similarity of Article 1, § 11 of the Indiana Constitution to that of the federal Fourth Amendment, Section 11 is interpreted separately and independently from Fourth Amendment jurisprudence." *State v. Washington*, 898 N.E.2d 1200, 1205–06 (Ind. 2008) (citing *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001)).

> The Indiana Constitution may protect searches that the federal Constitution does not. *State v. Moore*, 796 N.E.2d 764, 767 (Ind. Ct. App. 2003). Section 11 should be applied to protect people

---

[1] Although the Fourth Amendment and Article 1, Section 11, contain a few slight variations as to word tense, punctuation, and capitalization, generally, the language provided in both the Federal and Indiana Constitutions is the same.

from unreasonable search and seizure. *Brown v. State*, 653 N.E.2d 77, 79 (Ind. 1995). When police conduct is challenged as violating this section, the burden is on the State to show that the search was reasonable under the totality of the circumstances. *See, e.g.,* [*State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006)]; *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004). The determination of the reasonableness of a search and seizure under the Indiana Constitution turns "on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

*Id.* at 1206.

[13] In challenging the admission of the evidence, "Thayer does not challenge the constitutionality of the initial traffic stop." Appellant's Br. p. 15. Thayer concedes that Officer Webber's observation of the inoperable taillights and license plate illumination justified the initial stop. Thayer asserts that it is his "continued detention after the purpose of the traffic stop had been completed that is at issue." Appellant's Br. p. 15. For its part, the State claims that "Officer Webber did not delay the stop beyond the time reasonably required to complete the mission of the stop, and the dog sniff occurred before the completion of the stop." Appellee's Br. p. 11.

## A. Fourth Amendment

[14] In *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015), the United States Supreme Court held that

This case presents the question whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop. We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.

(Internal quotation marks and brackets omitted). The holding in *Rodriguez* is consistent with the Indiana Supreme Court's prior determination that a K9 sniff does not violate the Fourth Amendment if it does not prolong a traffic stop beyond the time necessary to address the traffic violation. *See Myers v. State*, 839 N.E.2d 1146, 1149 (Ind. 2005) (providing that a K9 sweep of the exterior of a vehicle does not intrude upon a Fourth Amendment privacy interest and does not violate the Fourth Amendment when the sweep was conducted before the traffic stop was completed).

[15] In this case, Officer Webber testified during the suppression hearing that he was still in the process of manually entering the necessary information into the ticket-issuance software when Officer Hyde arrived and conducted the K9 sniff. Officer Webber testified how the process of completing a traffic stop takes longer when the individual cannot provide a driver's license or identification card because additional steps can be necessary to properly identify the individual and all information relating to the identity of the individual has to be manually entered into the system instead of the information being self-generated when a driver's license or identification card is provided. In denying

Thayer's motion to suppress, the trial court considered Officer Webber's testimony regarding the additional steps he took to verify Thayer's identity and his need to manually enter all of Thayer's information and found it to be credible. Such a determination was within the trial court's purview. *See Perry v. State*, 78 N.E.3d 1, 8 (Ind. Ct. App. 2017) (providing that the factfinder, and not the appellate court, "is obliged to determine not only whom to believe, but also what portions of conflicting testimony to believe, and is not required to believe a witness's testimony even when it is uncontradicted").

[16] Thus, despite Thayer's claim to the contrary, the evidence supports the trial court's determination that the K9 sniff did not unjustifiably prolong the traffic stop, as Officer Webber had not yet completed the stop when Officer Hyde arrived and conducted the K9 sniff. Thayer's argument to the contrary amounts to an invitation to reweigh the evidence, which we will not do. *See Santana v. State*, 10 N.E.3d 76, 78 (Ind. Ct. App. 2014). Under the facts of this case, we conclude that the K9 sniff did not violate the Fourth Amendment. *See Rodriguez*, 575 U.S. at 350–51; *Myers*, 839 N.E.2d at 1149.

## B. Article 1, Section 11

[17] In challenging the search under Article 1, Section 11, Thayer argues that the K9 sniff was unreasonable. "To assess the reasonableness of an officer's actions under the totality of the circumstances, we must consider 'both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the subject of the search or seizure.'" *State v. Gibson*, 886 N.E.2d

639, 642–43 (Ind. Ct. App. 2008) (quoting *Myers*, 839 N.E.2d at 1153). Again, the "[f]actors we balance include: '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizens' ordinary activities, and 3) the extent of law enforcement needs.'" *Id.* at 643 (quoting *Myers*, 839 N.E.2d at 1153). Similar to the Fourth Amendment, a K9 sniff is unreasonable under Article 1, Section 11, "if the motorist is held for longer than necessary to complete the officer's work related to the traffic violation and the officer lacks reasonable suspicion that the motorist is engaged in criminal activity." *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013); *see also State v. Cassady*, 56 N.E.3d 662, 668 n.3 (Ind. Ct. App. 2016) (providing that a K9 sniff was not unreasonable under Article 1, Section 11, where the K9 sniff did not extend the traffic stop as the K9 sniff was completed while the officer was waiting on a response from dispatch).

[18] In this case, we conclude that Officer Webber had a reasonably high level of concern or suspicion that Thayer was engaged in criminal conduct at the time of the traffic stop. The record reveals that Thayer exhibited extreme nervousness, made repeated erratic and furtive movements, and was determined to have a potential for violence. Likewise, the level of intrusion in the K9 sniff, which, again, occurred before Officer Webber had completed the process of issuing tickets for the underlying traffic infractions, was low. Given that the Indiana Supreme Court has held that "a reasonable narcotics dog sweep is not a search for the purposes of" Article 1, Section 11, *Austin*, 997

N.E.2d at 1034, we agree with the State that a K9 sniff "of the exterior of the vehicle does not involve a significant intrusion on a person's privacy." Appellee's Br. p. 24. Also, given Thayer's behavior and potential for violence, we conclude that as a matter of public safety, it was reasonable for Officers Webber and Hyde to determine that the K9 sniff was necessary. Thayer's claim to the contrary again amounts to an invitation to reweigh the evidence, which we will not do. *See Santana*, 10 N.E.3d at 78.

[19] In conducting a K9 sniff, Officers Webber and Hyde used the least intrusive means available to detect the hidden contraband in Thayer's vehicle. Thayer concedes that the initial stop was valid. The K9 sniff did not unjustifiably extend the length of the initial traffic stop as it was completed before Officer Webber completed the process of issuing tickets for the observed traffic violations. Considering the totality of the circumstances in this case, we conclude that the K9 sniff was reasonable. As such, the K9 sniff did not violate Article 1, Section 11, of the Indiana Constitution.

[20] The judgment of the trial court is affirmed.

Robb, J., and Altice, J., concur.